Oral argument not to exceed 15 minutes per side. Mr. Rourke for the Defendant Appellant. May it please the Court, I represent Defendant Appellant Woody Medlock Sr and I'd like to reserve three minutes. You may. This case is on appeal from final criminal judgment in the Middle District of Tennessee sentencing Mr. Medlock to 75 months confinement following convictions for conspiracy, health care fraud, making false statements, wire fraud, and aggravated identity theft. Mr. Medlock Sr raised multiple issues on appeal. I'd like to use my time this morning to focus on two topics. First, the aggravated identity theft conviction and then second, the meaning of the term material or materiality as it relates to the health care fraud and the false statement convictions. Mr. Medlock is not guilty of aggravated identity theft in counts 40-41 in the indictment because as a matter of law he did not use the means of identification of the two alleged victims as used has been interpreted by this court's controlling authority in United States v. Miller, a decision which came out after the conviction of Mr. Medlock Sr in this case. Aggravated identity theft mandates a two-year consecutive criminal term for any defendant who quote uses another person's identity to commit certain predicate felonies including health care fraud. The aggravated identity victims in this case are Mary Jones and Maine Glimpse who were dialysis patients and longtime customers of Murfreesboro Ambulance Service which was owned by Mr. Medlock. The government's theory is that their identities were used when Mr. Medlock submitted Medicare claims saying that they had been transported by stretcher when in fact they had not been transported by stretcher. That is the government's theory is that Medlock committed aggravated identity theft because he submitted a claim to Medicare saying that Jones and Glimpse were not transported in the manner set forth on the claim. Well, they couldn't have picked out a name out of the blue and put it in there, couldn't they? They had to have somebody who had one of these certificates, right? Your Honor, that's absolutely right. In order to name and Medicare identifying number for the Medicare beneficiary in question. What is important to note here is the government didn't contend that Mr. Medlock illegitimately obtained their means of identification or impersonated them or otherwise stole their identities. The only alleged use of their identities in this case was the misrepresentation as to how they were transported. I mean, the people were actually transported. They were actual people. These were their actual Social Security numbers. It was just that it didn't meet the requirements for payment. That is correct. Would you concede that if they had been people that were not transported that it would have been a violation here? That if they simply put down the names of somebody who wasn't a client who you didn't transport. If they had put down the names of someone who was not a client or if they had even put down the names of persons who weren't clients but billed Medicare for trips that never occurred, I think that that would come closer to what is intended by use. But in this case, the trips occurred. Ms. Jones and Mr. Glimpse were transported by ambulance. They simply were not transported on stretchers. And our contention is if the misrepresentation is simply the manner of transport, that cannot constitute aggravated identity theft. And we would say that this... Why do you say that Miller supports you? You cited it, but you didn't start the argument on it. We think, or I think, Your Honor, that Miller is on all fours with our case in that the statutory construction that is set out in the Miller case for how use is to be interpreted in 1028A is controlling here. In Miller, the defendant was the manager of an LLC who submitted a loan application that listed the names of other members of the LLC and falsely represented that those members had authorized certain property to be pledged as collateral for a loan to the defendant. The government's theory in that case was that Miller used the names of those two investors by including their names in a resolution and falsely stating that they were present at a meeting in which they voted to allow the defendant to pledge property as collateral. The court in the Miller their names within the meaning of 1028A merely by lying about what they did and that his conduct couldn't constitute use as it is defined under the statute. So in Miller, he lied about what some other people did. In your case, you lied, in a sense, about what you did, I mean, your client. In Miller, the defendant said that two individuals had agreed for the property to be pledged as collateral when in fact they had not. And the court held in Miller that that could not constitute use of their identities. And we say that our situation is identical. It would be as if Mr. Glimpse and Ms. Jones had been on stretchers, then that would not have been aggravated identity theft. And the government's theory here is because they weren't on stretchers, that means that identity theft occurred. If those two people had been patients that they'd used before but they didn't transport them on that date, is that a use there under that identity law? I think that that is closer to use than what occurred in this case. But it would be a violation because they'd said Ms. whatever on January 1, but in fact she hadn't been transported since December 1. That would be much closer to a situation where, I'm not sure that you would say that they were impersonating the identities in that case, but they were employing the identities and billing for trips that had not, in fact, ever occurred. The government submitted a 28-J letter about this that gives them any comfort? I think the Tevis case is actually quite helpful to our position. In the Tevis case, the defendant used the social security number of an undocumented alien's 5-year-old son to get unsecured loans to pay for the construction of an 11,000-square-foot home. So in a situation like that, the defendant was absolutely impersonating or attempting to pass himself off as someone that he was not. The defendant clearly was not the son of the undocumented alien. That is not the factual situation that is presented here in this case. Are you saying that they proved that these two people were actually transported on this particular day, but they weren't on a stretcher? There is no dispute as to whether the patients were actually transported. The government's theory of liability here is that Mr. Medlock misrepresented or lied when he said that the patients were on stretchers when, in fact, they weren't on stretchers. Sometimes they were riding in the front seat of the ambulance. Do you want to try to talk about your second point while you still have some time? Yes, Your Honor. The convictions for health care fraud and making false statements must be reversed because the trial court's instruction regarding materiality was incorrect statements of the law. There are two problems with the jury instructions. The first is that the court failed to instruct the jury that misrepresentations had to be material to Medicare and not just to the average person. And second, the court failed to instruct regarding CMS's special rule governing reimbursement of non-emergency ambulance transports. And both of these prejudice Mr. Medlock's ability to present a defense in this case. The instruction that the court gave for both 1347 and 1035 was that a statement would be material if it would have the natural tendency to influence a person. The court did not instruct the jury that the statement could only be material if it would have impacted Medicare's decision. And here, where the case involves claims that were submitted to Medicare, what would be relevant is not what the average person on the street thought would be material. The only thing that would be relevant in this case is would the false statement have the tendency to influence Medicare's decision. And we've cited for the court the Natale case, a 2013 case from the Seventh Circuit that examines this very issue and found that the trial court in that case failed to properly instruct the jury on a 1035 charge when it did not tell the jury that the statement would have to be material to Medicare. So your argument is that even if Medicare had known that these weren't stretcher cases they would have cheerfully paid anyway? There's a couple of parts to that, your honor. Our argument is that the jury should have been, the jury was not asked the right question in this case, which would have been, were these claims that would not have been paid by Medicare? The other part of that question is CMS has a... I guess maybe that's my question. You would win, you would get acquitted if the jury believed that Medicare was so sloppy or fraudulent that they would cheerfully have paid them even if they'd known they were fraudulent. It has nothing to do with whether Medicare was sloppy or fraudulent. Medicare has a rule, we cited it in our papers, it's 410-40DD2, that for scheduled, repetitive, non-emergency transports, Medicare pays those claims if there is a certificate of medical necessity. The reason for that is we're not talking about emergency transports, we're talking about things that routinely have to be taken for care. That in cases like that, Medicare passed a rule saying if there's a certificate of medical necessity, then the trip should be paid. We cited two district court cases from the Middle District of Tennessee examining that very regulation and agreeing with our interpretation. Whether the trial judge in our case disagreed with that interpretation or not, the jury should have still been instructed on the circumstances under which Medicare would pay claims. What is a run ticket? I don't understand that. So when the ambulance company provides the trip, it has to fill out some documentation as to what happened during the trip, and if I can finish, Your Honor. The run ticket is what the ambulance company fills out that says, we picked up the patient this time, this date, we took them from this location to this destination. A key point that I would like to point out is, what is alleged in this case is not false statements on run tickets. What is alleged in this case was that a false statement was made on a Medicare claim, and it is that statement that was not material to the payment decision. So you're saying, basically, though again, you're saying that Medicare would pay on the run ticket whether they should have or not? Under their regulation, if there is a certificate of medical necessity, which those were entered in this case, under their regulation, they would pay the claim. You're saying they didn't even have to have a run ticket. They'll pay on the CMN, right? Your Honor, there are other regulations that require the run tickets to be in place. So my argument is not that they didn't need run tickets. The sole issue in this case was, did Mr. Medlock make false statements when he said on the claim form that the patient was on a stretcher when, in fact, the patient was not? And what our position is, is whether the patient was on a stretcher or not is simply not material to the payment of the claim. Thank you, Counsel. You'll have your time for rebuttal. Good morning, Your Honors. It may please the Court. I'm Sandra Moses, representing the United States. In regard to the defense argument about the aggravated identity theft statute and the Miller case, it is the government's position that Miller is starkly in contrast to the Medlock case. The defense argument is that use does not encompass the activity that occurred in this case, the way the names were used, the way the patient information names, their Medicare number, which is the Social Security number with the letter attached, date of birth, address, medical condition. All that was used on these claim forms for payment for runs that the evidence clearly showed did not qualify for Medicare coverage. Under the Social Security Act itself, it says to qualify for Medicare coverage, the need for the amortization must be medically necessary. In this case, the evidence clearly showed that the beneficiaries did not need an ambulance. Every single one of them. The issue is about what does this use mean? You've convicted them of fraud on other bases. For example, if the proper rate was $100 and they billed you for $120, under your theory, that would be identity theft as well, wouldn't it? They used it to fill out the forms and they lied about something relevant to get more money, which is all you're saying here. They lied about something relevant to get more money. Your Honor, if I may, let's go to the court's definition of use in the pattern jury instruction. It is to actively employ. In this case, without the use of the name, Medicare number, and the other identifying information for these patients, there would have been no claim. But how is that different from Miller, where without the names of the other people whose concurrence was necessary, they wouldn't have gotten the money? Well, it is different from Miller because in Miller, and if I'm, my interpretation of Miller, and I know Judge Clay was on that, as was I, the difference in the Miller case is it was more of an indirect use. And as even distinguished by this court in the comments to the jury instruction, in that case, only the name was used. There was no other identifying information other than the name. And in Miller, Mr. Miller said, well, these people said that I could do this. The loan was his own. The loan was in his name. In this case, the identifying information, the information of these beneficiaries, was essential to a claim. There was no claim without it. Now, I also disagree with the appellant's description of, or the finding in Miller, that it had to mean certain things. Miller did not define the word use. What Miller said was both parties' description, both parties' interpretation is reasonable, so it invoked the rule of lenity to hold what use was not. And under the facts of that case, the court found that use did not encompass, where a name is used alone, saying that someone did something that they did not do. It was... That's what we have here, isn't it? No, it's not, because what we have here is what Medicare, the Medlock said in the claim, we transported these patients via stretcher. A stretcher was required. It's what they did, not what the beneficiaries did. It wasn't the beneficiary, the action. They're seeking reimbursement for what they did, not for what the beneficiaries did. So it's a completely different situation. And if you go back to the definition of use is to actively employ. Here without using the identifying information of these beneficiaries, there would have been no claim. But then why in Miller, without actively using the names of the associates, they would not have gotten what they wanted? Which was... I mean, that's... In a sense, that's the problem. Maybe Miller's right or not, but it's a pretty clear holding that at least simply lying about... You know, what they did, what they were convicted of was basically lying about some of the things that they did. And are you trying to argue that because they lied about what they did rather than Mr. Miller who lied about what somebody else did, they're both lies using other people's information, right? I mean, that's using, that's what we're concerned about. Right. It doesn't... The statute doesn't say anything about the identity of another person. It doesn't define what else it is, right? Statute does not say that you have to be acting on behalf of another person or you have to impersonate another person. There is nothing in the statute that requires that. And there is nothing in Miller that says you have... The appellant in their brief said that Miller's argument was that you have to act on behalf of another person or impersonate another person or along those lines and that the court agreed. But in my reading of Miller, the court did not agree to what the Miller said you meant. The court said under the facts of this case where you, where the defendant is saying that these other people told me I could do this, these other people gave me permission without more than just the use of their names, that that is not, that takes it too far. That is not use under the statute. But there is nothing in the statute that says you have to impersonate or you... And the case law is clear against that. In fact, Your Honor, in Lombard, Your Honor, Judge Baez, you were on that case and in that case you found that there doesn't have, that even if there's complicity, if you have taken someone's, the identifying information and you have used it to commit a crime that's enumerated in the statute, then you have, then you have committed aggravated identity theft. Okay. Proceed. All right. Your Honor, in regard to the Medicare special regulation, the appellant's argument is that regulation requires Medicare to pay and that under that regulation, Medicare paid only if they had a CMN or a PCS. Well, as again, the Social Security Act requires that it be medically necessary and that regulation itself says a medically necessary transport will qualify under Medicare also if you have a PCS. The evidence at trial was that, was that, did not support at all what the appellant is arguing. The evidence at trial showed that at least from 2000 when the opinion witness who worked for the CAHABA, which was the MAC at the time, the medical authority, I always forget what it stands for, but that always what was important was whether or not the ambulance company could support that the run was medically necessary and that was determined via the description that was on the run ticket. In fact, her testimony was, and the government's not saying that she is the expert on that regulation or what the regulation meant or whatever, but the guidance that she was provided and that other MACs were provided from Medicare says that the certificate of medical necessity standing alone does not dictate payment. It still has to be medically necessary. And in this case, you have people riding in the front seat. There was video to every single one of the counts charged in the indictment. There was evidence showing that these people rode in the front seat. In some cases, there were videotape of one of the beneficiaries walking around the parking lot in the dialysis unit, kicking a tire, opening a door for another patient. They stopped at a restaurant and he hopped out of the front seat on his own while they sat there with their flashers on and a patient in the back goes in, gets his lunch, comes back out, climbs into the cab of the ambulance and they go on to take the patient in the back home. But they don't have that on all the patients. What do they require for payment? Every one of the patients were in the front seat. And what they require is that they could not have gone in any other way, that they couldn't sit up in a car, ride in a car, sit up, walk, stand. That's what is required. And in this case, in fact, on one of the claims they had actually put in, could not sit in moving vehicle. But the beneficiary was riding in the front seat. And another claim not only said that a stretcher was required, it said a draw sheet was used. That was the patient that's walking around the parking lot. So what you have here is what the appellant wants you to find is that even this PCS requirement, and let me back up a little bit, the PCS requirement, if you look at the commentary of why they put in that requirement, it was to ensure that the runs were medically necessary. And it even says in that commentary, which is cited by both parties, that 75 percent at that time, 75 percent of ambulance transports had been determined not to be medically necessary. And by adding this requirement, this was just another layer to ensure that they would be. So here, if you find that this regulation required payment, and that's what Medicare, they intended to give up their authority to decide what payments and give it to a random doctor who may or may not have the integrity of the Medicare program in their interest, it doesn't make any sense at all. It totally defeats the purpose of putting that regulation in to begin with. So in this case, for every patient that was listed, did they have some kind of video coverage or eyesight by a witness to show that that person didn't need to be on a stretcher or didn't need to be sitting up front or whatever? Yes, Your Honor. For every patient, for every count in the indictment, there was either, for nearly every one of them, there was video. On a couple, I believe, you had just the eye of the agent who testified at trial that he How many patients were in the case? Just a few. Well, the testimony at trial, there were four that were actually charged in the indictment. There was a fifth, Jimmy Cole, who was, there was a lot of testimony at trial. He did not go to the same dialysis clinic. He went to a different dialysis clinic, and the agents did not have, were not conducting surveillance at that clinic, but there was a lot of testimony that he regularly rode in the front seat. There was a lot of testimony that these four that were in the indictment regularly rode in the front seat. There may occasionally have been on a stretcher, but that usually was when the Medicare was at the clinic, and someone at the clinic called the med locks and said, Medicare's at DCI today. Everybody needs to be on a stretcher. But the counts of conviction, and there were quite a number, 18 or so, were they just about these four or five? They were just the four. The four. And there was also testimony that it's not only these five, but there were other people that were also. But the counts of conviction, there were several counts for each person, or there were some of them. That is correct, Your Honor. That's correct. The run sheets didn't make any difference on payment at all? Well, the run sheets were what determined if, what, Medicare is an honor-based system, so basically you're paid up front unless there's information that is received that there's something screwy going on, and that's kind of what happened in this case. That's when they go back and audit, and they view the run tickets to determine whether or not it qualifies for payment. The medical necessity form is another thing that they're required to have, but the testimony at trial was, look, if the run ticket shows that it was medically necessary, even if they don't have the certificate of medical necessity, then we still have the authority to go ahead and pay it. But the run ticket is the starting item. I mean, it's like if I have a time card at a factory, if it looks okay, they'll pay me on my time card, even though I've got somebody punching in for me. Well, yes, but the run ticket doesn't go to, it's there if you have to go back. It's not submitted with the claim. But they have, like, just some form where they put in some of that information, or? Yes, it goes on the claim, and I see my time's up, but it goes on to, it's on the claim. So I would have a claim, maybe I'd have, what, ten runs on one claim, or just ten forms, but I don't submit the run ticket at the same time? No, if it goes back and does the audit, then they look at the run ticket, because what's important is the beneficiary's condition at the time of the transport, and the run ticket is the thing that shows that. Are there copies of the run tickets in the record, or some of them? All of them. All of them, Your Honor, for these. OK, anything else? Thank you, counsel. You have three minutes for rebuttal. This is what the trial court described the use of the identity theft statute in this case as. This is sort of non-traditional identity theft. That's in the record. And again, this case was tried before the Miller decision. Despite the government's arguments, we believe the holding in Miller is clear and it's controlling here. And I want to make sure the court understands, it's not our position that Miller necessarily adopted a different definition of use, but we're saying that the analysis applied by Miller to interpret 1028A is the same analysis here. And what Miller held was that after going through that analysis, there was nothing inherent in the term of the word use in its placement in the text or the legislative history that indicated that it was broad enough to reach the mere act of saying that a person did something that they did not, in fact, do. And what we're arguing here is the statute is ambiguous as applied, and under the rule of lenity, the conviction cannot stand. There is some difference here, isn't there, in that it is true that in Miller, you lied about what the other person did. Here, you lied about what you did, although the person was there. I would see it as... I'm not sure which way that cuts, but it is a difference. In Miller, it was a lie that the person had approved the pledge of the property. Here, it is a lie about the manner in which the patients were transported, and I would not see a difference here. As the court pointed out, if they're supposed to be paid $100, but they billed for $120, that would still be, under the government's view, that would still be considered use. And it's our view that he didn't use their identities merely by lying about how they were transported. Do you think it's an identity theft here if your client had sent that in on one of these people like Ms. Jones and said she was transported to the place where she was getting treatment, but they transported her to the grocery store instead? She picked up her groceries and they brought her home. Is that identity theft? I don't think that would constitute use either, because it would, again, go to making misrepresentations about how the person was transported, and it doesn't involve the stealing or impersonating them. I want to briefly address the issue of it appears that the government's view is that the conviction should be upheld in this case because the transports were not medically necessary, and I want to point out for the court that it's important to look at how this case was charged. We pointed out to the court from the trial record, it's document 199, memorandum regarding materiality instruction, where the government said this case has nothing to do whatsoever with medical necessity. In fact, the government moved in limine to keep out from proof at trial any evidence regarding the medical condition of these patients. In light of that, the only thing that is relevant here is whether the statement on the claim that the patient was not on a stretcher, whether that would have been relevant to Medicare. Both sides are going to disagree over proper interpretation of these regulations and whether payment should have been made, but our point is that that should have at least gone into the jury instructions so that the jury could have understood the question that it was being called on to answer, and that did not happen. Excuse me. Thank you, counsel. Thank you. The case will be submitted. The clerk may call the next case.